**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SHERRY MENG,                              )
                                          )
            Plaintiff,                    )       Case No. 12-cv-8232
                                          )
    v.                                    )       Judge Robert M. Dow, Jr.
                                          )
ARAMARK CORPORATION,                      )
                                          )
            Defendant.                    )

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant's motion for summary judgment [36]. Plaintiff alleges that her former employer, Defendant Aramark Corporation, subjected her to a hostile work environment and retaliated against her in violation of Title VII of the Civil Rights Act of 1964 and the Illinois Human Rights Act. For the reasons that follow, Defendant's motion [36] is denied. This case is set for status on 4/21/2015 at 9:00 a.m.

I.      **Background**

        A.      **Statements of Facts**

        The Court has taken the relevant facts from the parties' Local Rule ("L.R.") 56.1 Statements, which include Defendant's L.R. 56.1(a)(3) Statement of Material Facts [38], Plaintiff's L.R. 56.1(b)(3)(B) Response to Defendant's L.R. 56.1 Statement [43], Plaintiff's L.R. 56.1(b)(3)(C) Statement of Additional Facts [44], and Defendant's Response to Plaintiff's Additional Facts [53]. Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and which entitles the movant to judgment as a matter of law. As the Seventh Circuit has stressed, facts are to be set forth in Rule 56.1 statements, and it is not the role of the Court to parse the parties'

exhibits to construct the facts. Judges are not "like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991). It simply is not the Court's job to sift through the record to find evidence to support a party's claim. *Davis v. Carter,* 452 F.3d 686, 692 (7th Cir. 2006). Rather, it is "[a]n advocate's job * * * to make it easy for the court to rule in [her] client's favor[.]" *Dal Pozzo v. Basic Machinery Co.*, 463 F.3d 609, 613 (7th Cir. 2006).

The Court carefully reviews the parties' statements of material facts and eliminates from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support. See, *e.g.*, *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, 2006 WL 980740, at *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004). Merely including facts in a responsive memorandum is insufficient to put issues before the Court. *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1313 (7th Cir. 1995); *Malec v. Sanford*, 191 F.R.D. 581, 594 (N.D. Ill. 2000). Rule 56.1 also requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec*, 191 F.R.D. at 583–85. Where a party improperly denies a statement of fact by failing to provide support for the denial, the Court deems that statement of fact to be admitted.

Defendant raises several threshold issues with respect to Plaintiff's fact statements. First, Defendant contends that several of the responses set forth in Plaintiff's Response to Defendant's L.R. 56.1 Statement [43] are improper and should be disregarded because Plaintiff includes additional facts that do not directly support her denial of a particular fact. Although some of Plaintiff's responses do exceed the "concise response" that L.R. 56.1(b)(3) describes, the Court will not automatically deem Defendant's proposed uncontested facts to be admitted,

but instead will disregard the portions of Plaintiff's Response that do not support her disagreement with a particular fact. See, *e.g.*, *Griffin v. Daubert Chem. Co.*, 2005 WL 1563212, at *3 (N.D. Ill. June 2, 2005) ("[T]he Court disregards all argumentative, conclusory, unsupported, inadmissible, or otherwise non-conforming portions of the respective Rule 56.1 statements.").

Defendant also argues that Plaintiff's Statement of Additional Facts [44] is improper because several paragraphs therein contain multiple allegations per paragraph and incorporate hearsay. As to the first issue, the Court does not find Plaintiff's paragraphs to be so lengthy or unwieldy that they should be disregarded. With respect to the hearsay issue, Defendant appears to take issue with both the form of Plaintiff's evidence (for example, Plaintiff's general reliance on a declaration by Aramark employee, Juan Campos) and the admissibility of certain testimony contained in various depositions and declarations.

"[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial, except that affidavits and depositions, which (especially affidavits) are not generally admissible at trial, are admissible in summary judgment proceedings to establish the truth of what is attested or deposed, provided, of course, that the affiant's or deponent's testimony would be admissible if he were testifying live." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). To the extent that Defendant raises hearsay objections with respect to certain testimony, the Court will consider such objections as needed. Cf. *id.* at 743 ("There are many exceptions to the rule that makes hearsay evidence inadmissible at a trial; if none of them is applicable, the 'evidence' submitted in opposition to summary judgment is likely to be pretty worthless."). Plaintiff's reliance on declarations in general, however, is proper at summary judgment. See *Modrowski v. Pigatto*, 712 F.3d 1166, 1168–69 (7th Cir. 2013) (explaining that

the non-movant "need not * * * produce evidence in a form that would be admissible at trial" and may go beyond the pleadings by producing affidavits, depositions, answers to interrogatories, or admissions on file to demonstrate that there is evidence upon which a jury properly could find in her favor).

**B.      Facts**

Plaintiff Sherry Meng, a 29-year-old female, began working for Defendant Aramark Corporation in July 2010 as a Food Services Director. [44], Pl.'s Add'l Facts ¶ 1; [38], Def.'s Fact Stmt. ¶ 4. Plaintiff worked at the Chase Tower in downtown Chicago until she was transferred in October 2011 to another Chase facility in Elgin, Illinois (the "Chase Tower" and the "Elgin location," respectively). Plaintiff's immediate supervisor was District Manager Jim Bruce. See [38], Def.'s Fact Stmt. ¶ 5. At the Chase Tower, Plaintiff worked with managers Kristi Kuusisto (Assistant Food Services Director) and Wade Fortin (executive chef), and with lead cashier Esmeralda Barajas and sous-chef Luca Lucic.[1] *Id.* at ¶¶ 6, 8.

In June 2011, Bruce rated Plaintiff's performance as "Needs Improvement." [38], Def.'s Fact Stmt. ¶ 11. He also wrote that her "lack of improvement or any further declines in performance will result in further performance management and/or disciplinary action up to and including termination." *Id.* at ¶ 12. In late September or early October 2011, Bruce also asked another Food Services Director, who worked at one of the other locations that Bruce supervised, to spend time at the Chase Tower to help with Chase's transition to a new food vendor called Compass. *Id.* at ¶ 54. Plaintiff disputes that Bruce's decision was based on her continued poor performance. [43], Pl.'s Resp. ¶ 54.

---

[1]The parties spell Lucic's name in various ways in their submissions to the Court. "Luca Lucic" will be used throughout this memorandum opinion.

**Plaintiff's discovery of graphic graffiti drawings in the men's locker room**

Aramark employees had access to a men's locker room in the basement of the Chase Tower. [38], Def.'s Fact Stmt. ¶ 13. On Friday, September 23, 2011, Plaintiff learned from Aramark's assistant comptroller, Juan Campos, that someone had drawn pictures of her of a sexual and graphic nature in the bathroom stalls of the locker room. *Id.* at ¶ 15. Campos asked whether Plaintiff had "heard about the drawings" or "[knew] about the drawings" and seemed surprised that Plaintiff was unaware of them. [43], Pl.'s Resp. ¶ 15. The drawings depicted Plaintiff in the nude performing sexual acts. [38], Def.'s Fact Stmt. ¶¶ 17, 19; [43], Pl's Resp. ¶ 19. Other Aramark employees also were depicted, although the parties dispute whether the others were depicted in the same graphic manner as Plaintiff. [43], Pl.'s Resp. ¶ 19.

An Aramark utility associate, Jose Gutierrez, stated that the drawings had been on the bathroom stalls for at least a month prior to the date that Plaintiff learned of them. [44], Pl.'s Add'l Facts ¶ 1. Other Aramark employees were aware of the drawings but failed to report them to Bruce. See *id.* at ¶¶ 3, 6, 11. Bruce testified, for example, that Kuusisto, who knew of the drawings by September 21, 2011, was in violation of the company's sexual harassment policy by not reporting them. *Id.* at ¶ 8. Campos also stated that he learned from Esmeralda Barajas that photographs of the drawings had been posted to Facebook, that he observed Barajas trying to find the photos on her phone, and that Barajas tried to access Facebook to show him the photos. *Id.* at ¶ 14. Plaintiff testified that Barajas also tried to show her the Facebook page and that she subsequently observed a group of employees passing around a phone during lunch. *Id.* at ¶ 25. Gutierrez further stated that he observed Lucic making jokes and laughing about the drawings during a meeting on September 22, 2011. *Id.* at ¶ 16.[2]

---

[2] Defendant contends that Gutierrez's testimony about Lucic's jokes is hearsay. To the contrary, this testimony is admissible because Plaintiff is not offering it to prove the truth of what Lucic's jokes

On September 23, 2011, after hearing of the drawings from Campos, Plaintiff went to the locker room and observed the drawings for about five minutes, [43], Pl.'s Resp. ¶ 18, and then attempted to match the handwriting on the walls with handwriting contained in employee personnel files, [38], Def.'s Fact Stmt. ¶ 22.  Plaintiff returned to the men's locker room later that day to photograph the drawings.  [38], Def.'s Fact Stmt. ¶¶ 23, 25.  Plaintiff called or texted Bruce on September 23 and asked him to get in touch with her.  [43], Pl.'s Resp. ¶ 26.  Plaintiff testified that she was upset and angry after seeing the drawings and was crying, hysterical, and distraught.  [44], Pl.'s Add'l Facts ¶ 18.

When Plaintiff returned to work on Monday, September 26, the drawings had been removed.  [38], Def.'s Fact Stmt. ¶ 28.  During her usual pre-shift meeting, Plaintiff discussed the drawings with the Aramark staff and stated that the graffiti was grounds for termination.  *Id.* at ¶ 29.  Bruce learned of the drawings that day from his superior and called Plaintiff to let her know that Aramark's Human Resources Director, Jennifer Elliott, would be reaching out to her; Elliott left phone messages for Plaintiff that week and met with Plaintiff about the incident the following week on October 4.  *Id.* at ¶¶ 31–32, 36, 38.

Plaintiff testified that during her meeting with Elliott, she told Elliott everything that she knew about the situation, including that the drawings had been up for some time, that a supervisor had taken two hourly employees into the locker room to show them the pictures, and that the incident had not been investigated.  [44], Pl.'s Add'l Facts ¶ 35.  During the meeting, Elliott took no notes and declined to look at the photos that Plaintiff had taken of the graffiti.  *Id.* at ¶ 36.  The parties dispute whether Plaintiff conveyed discomfort with remaining at the Chase

---

asserted, but rather simply to show that Lucic was joking with employees during the work day about the graffiti.  See, *e.g.*, *U.S. v. Breland*, 356 F.3d 787, 792 (7th Cir. 2004) ("If * * * an extrajudicial utterance is offered, not as an assertion to evidence the matter asserted, but without reference to the truth of the matter asserted, the hearsay rule does not apply.") (quoting *Lee v. McCaughtry*, 892 F.3d 1318, 1324 (7th Cir. 1990)) (internal quotation marks omitted).

Tower. Elliott contends that Plaintiff told her that she was uncomfortable at the Chase Tower and that she never indicated that she wanted to remain there, [53], Def.'s Resp. to Add'l Facts ¶ 37, while Plaintiff asserts that she told Elliott that she was comfortable remaining at the Chase Tower, despite the incident, [44], Pl.'s Add'l Facts ¶ 37. The parties also dispute whether Elliott stated that she would not be able to determine who was responsible for the drawings. *Id.* at ¶ 38.

On Tuesday, September 27, two business days after Plaintiff learned of the drawings, Plaintiff again discussed the incident with the Aramark staff during a pre-shift meeting, with Bruce standing nearby. [38], Def.'s Fact Stmt. ¶ 33. Bruce met with Plaintiff later that day, and Plaintiff expressed to him her "shock and disappointment," stating that she would "always wonder if the person who drew the pictures was working next to her." *Id.* at ¶¶ 34–35. Plaintiff testified that she showed Bruce the photos that she had taken and that she informed Bruce that photos of the drawings were posted on Facebook, that Aramark employees were posting comments on Facebook about the pictures, that Lucic had taken female employees down to the locker room to show them the drawings, and that she believed that employees were looking at the Facebook postings on their cell phones during lunch. [44], Pl.'s Add'l Facts ¶¶ 27–30. In discussing these incidents, Bruce said something to the effect of "You can't change stupid people. You're doing a good job." *Id.* at ¶ 29. Bruce denies ever seeing the photographs or making the above comment. *Id.* at ¶¶ 30–31. Plaintiff asserts that she pressed Bruce two or three times to investigate her complaints. *Id.* at ¶ 33.

It is undisputed that Bruce proceeded to interview at least some Aramark employees about the incident. Bruce testified that as part of his investigation, he interviewed Fortin, Kuusisto, the management team, and hourly associates, [45], Ex. B, Bruce Tr. 59:10–60:13, while Plaintiff contends that he only interviewed "a couple key people," [45], Ex. A, Meng Tr.

129:17–130:5.  Bruce took no notes during his interviews.  [45], Ex. B, Bruce Tr. 53:7–54:1.  No

one was able to determine who was responsible for the drawings.  Def.'s Fact Stmt. ¶ 39.

**Plaintiff's Transfer to the Elgin Location**

During this time, Chase selected a new food vendor called Compass to replace Aramark

at the Chase facilities.  Defendant told its employees that by mid-December, Aramark would no

longer be operating at the Chase Tower or Elgin locations.  Def.'s Fact Stmt. ¶ 43.  Part of

Bruce's responsibility during this time was finding new positions for salaried managers who no

longer would be able to work at the Chase locations.  [45], Ex. B, Bruce Tr. 68:14–24.  Plaintiff

testified that Elliott informed her at a town hall meeting that Aramark wanted to find places for

all of its managers, and that Aramark would "float" or "bench" managers for six months after the

Chase account closed.  [45], Ex. A., Meng Tr. 61:2–16.

Shortly thereafter, Bruce told Plaintiff of a permanent opening within the company in

Lake Forest, Illinois.  [38], Def.'s Fact Stmt.¶¶ 46–47.  Plaintiff interviewed for the position on

October 3, 2011, and the Lake Forest manager offered Plaintiff the job on the spot.  *Id.* at ¶ 48.

Plaintiff did not accept immediately, and the Lake Forest manager told Plaintiff to get back to

her by the end of the week.  [43], Pl.'s Resp. ¶ 49.  Plaintiff never called back to accept the job.

According to Plaintiff, on October 7, the day that she needed to get back to the Lake Forest

manager, Bruce told her in an angry and aggressive not to call the manager back and that there

had been a change of plans, because Plaintiff was being transferred to the Elgin location where

she would remain until the Chase account closed.  *Id.* at ¶ 52; [38], Def.'s Fact Stmt. ¶ 57.  Bruce

denies instructing Plaintiff to forgo the Lake Forest position, [44], Pl.'s Add'l Facts ¶ 51, but

explains that Plaintiff was needed in the Elgin location because the food service director there

had resigned, [38], Def.'s Fact Stmt. ¶¶ 55, 56.  That same day, Bruce wrote in an email to Elliott

and his supervisor that Plaintiff was being transferred to Elgin because she was not comfortable continuing to work at the Chase Tower after the graffiti incident. [43], Pl.'s Resp. ¶ 56. Plaintiff, on the other hand, contends that she was transferred to Elgin in "retaliation and punishment for [her] complaints" to Elliott and Bruce about the drawings and related incidents. See *id.* Plaintiff's job title, pay, and benefits remained the same at Elgin, but Plaintiff preferred working at the Chase Tower for various reasons. [38], Def.'s Fact Stmt. ¶ 59.

In October 2011, Bruce received two complaints about Plaintiff, and in response instructed her to communicate all transitional questions to him directly. See [38], Def.'s Fact Stmt. ¶¶ 64–68. The Elgin location closed in early November 2011 as planned. Bruce informed Plaintiff that he did not have another position for her, but told her to check online for other available positions at Aramark and said that he would introduce her to more people at Compass (the company taking over the Chase account). See *id.* at ¶¶ 71–72. Bruce previously had introduced Plaintiff to the Regional District Manager for Compass, and Plaintiff submitted her resume to him. *Id.* at ¶ 53. In mid-November, Plaintiff applied to four open positions at Aramark but was not offered any of them. See *id.* at ¶¶ 74–76. Bruce offered to meet with Plaintiff in November, presumably to discuss job prospects, but Plaintiff was out of town at the time. See *id.* at ¶ 78. Plaintiff never contacted Bruce when she returned to Chicago and accepted a job with Compass as a general manager for food service, which began shortly thereafter on December 5, 2011. *Id.* at ¶¶ 79–80.

## II.     Summary Judgment Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To avoid summary judgment, the opposing party must go beyond the pleadings and "set

forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson,* 477 U.S. at 252.

### III.    Discussion

Plaintiff asserts hostile work environment and retaliation claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq.* (IHRA). Plaintiff seeks backpay, frontpay, and other employment benefits that she allegedly was denied, compensatory and punitive damages, attorneys' fees, and injunctive relief. See [1], Compl. at 10, 12. Plaintiff's IHRA claims largely are analyzed under the same legal framework as her Title VII claims. See *Thomas v. Comcast of Chi., Inc.*, 2012 WL 3205008, at *5 n.1 (N.D. Ill. Aug. 2, 2012) (noting that the same legal framework applies to hostile work environment claims under the IHRA and Title VII); *Hoffelt v. Illinois Dep't of Human Rights*, 367 Ill. App. 3d 628, 634 (Ill. App. Ct. 1st Dist. 2006) (noting that Illinois courts

consider analogous federal cases arising under Title VII to determine whether retaliation is actionable under the IHRA). Defendant moves for summary judgment on both claims. For the reasons that follow, Defendant's motion is denied.

### A. Hostile Work Environment

"When sexual harassment in the workplace alters the terms and conditions of one's employment, it falls within the scope of the prohibition against sex discrimination in Title VII." *Smith v. Sheahan*, 189 F.3d 529, 532 (7th Cir. 1999). Plaintiff contends that the graffiti that depicted her in a graphic and sexual manner—as well as Lucic's jokes about the drawings, the posting of the drawings on Facebook, and her co-workers' failure to report the drawings—created a hostile work environment. To establish a *prima facie* case on this claim, Plaintiff must offer evidence that "(1) her work environment was both objectively and subjectively offensive; (2) the harassment complained of was based on her [gender]; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability." *Porter v. City of Chicago*, 700 F.3d 944, 955 (7th Cir. 2012).

Defendant does not dispute (at least for purposes of summary judgment) that Plaintiff has established the first element—a subjectively and objectively offensive work environment. Indeed, Plaintiff has testified that the drawings and related conduct angered, offended, and embarrassed her, made her distraught, and caused her to tremble and cry at work. Defendant characterizes the drawings as "undoubtedly disturbing and disgusting," [37], Def.'s Mem. at 1, and one of its managers, Kuusisto, who also viewed the drawings, stated that they were "offensive," "sexually explicit," and uncomfortable for any person to view. [45], Ex. D, Kuusisto Tr. 35:10–13; 51:12–17. Defendant instead takes issue with the remaining elements and argues that the conduct at issue was not sufficiently severe or pervasive and was not based

on Plaintiff's sex. Defendant also argues that there is no basis for its liability because it responded to Plaintiff's complaints in a reasonable and appropriate fashion. The Court addresses these remaining issues below.

### 1.    Severe or pervasive conduct

"[S]exual harassment is actionable under Title VII only when it is 'sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806 (7th Cir. 2000) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 66, 67 (1986)) (other internal quotation marks omitted). It is well established that "conduct that is *either* pervasive *or* severe may give rise to a hostile work environment." *Cerros v. Steel Tech., Inc.*, 398 F.3d 944, 950 (7th Cir. 2005) (emphasis in original). In determining whether conduct is sufficiently severe or pervasive, "courts must examine all of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Smith*, 189 F.3d at 533–34 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Conduct that the plaintiff did not experience firsthand also may be considered, as "incidents 'directed at others and not the plaintiff * * * do have some relevance in demonstrating the existence of a hostile work environment.'" *Id.* at 534 (quoting *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997)).

Defendant characterizes the harassment that Plaintiff experienced as the mere 15 to 20 minutes during which Plaintiff viewed the graffiti on September 23, 2011. Several other incidents too are relevant in assessing Plaintiff's work environment—namely, that another manager knew of the drawings, but failed to report them, that Lucic took two female employees

down to the locker room to show them the drawings, that the drawings had been up for some time, that employees were discussing them at work, that photographs of the drawings were uploaded to Facebook,[3] that Lucic joked about the drawings at a meeting with other employees, and that Bruce, Plaintiff's supervisor, brushed off Plaintiff's complaints about the Facebook postings. Although these incidents took place in a relatively short time frame and were not long-lasting, a reasonable jury nonetheless could find that these incidents, taken together, were sufficiently humiliating to alter Plaintiff's work environment.

To begin, the graffiti is obscene, misogynistic, and graphic, and depicts what could reasonably be construed as Plaintiff being sexually exploited or assaulted. One drawing depicts Plaintiff on her hands and knees engaging in sex with the caption, "Take it Bitch Sherry." [45], Ex. 9 to Meng Tr. Another shows her touching a parade of penises while being penetrated, with the caption "Sherry inventory" and her initials "SM." See *id.* Defendant emphasizes the lack of any unwelcome physical contact in this case. That is not dispositive, however, as the Seventh Circuit has implied that offensive graffiti may be sufficient to create a hostile work environment. See *Cerros*, 398 F.3d at 950–51 (remanding for new trial on hostile work environment claim and requiring district court to consider whether graffiti containing racial epithets in bathroom was sufficiently severe or pervasive to create a hostile working environment). See also *Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 880 (D. Minn. 1993) ("The posting of sexually-oriented materials in common areas may serve as evidence of a hostile work environment.") (citing *Bennett v. Corroon & Black Corp.*, 845 F.2d 104, 106 (5th Cir. 1988)). Further, "sexual

_____

[3] Defendant argues that the Court should ignore Plaintiff's contention that photos of the drawings were posted on Facebook, because there is no evidence of the photos actually on Facebook, Plaintiff did not see the Facebook page, and the only evidence of Facebook postings is hearsay. The Court respectfully disagrees and believes that Plaintiff has put forth a genuine issue of material fact on this issue. For example, one of Defendant's employees stated that he "*saw* [another employee] trying to find the pictures on her phone and then tried to access Facebook and bring up the pictures on her cellular phone," [45], Ex. H, Campos Decl. ¶ 20 (emphasis added).

13

assaults," "intimidating words or acts," "pornographic pictures," and "obscene language" lie on the actionable side of the line that divides "'deeply offensive and sexually harassing'" conduct from "'merely vulgar and mildly offensive'" conduct. *Hostetler*, 218 F.3d at 807 (quoting *Carr v. Allison Gas Turbine Division*, 32 F.3d 1007, 1010 (7th Cir. 1994)). Although Plaintiff was not subjected to any unwanted physical contact, the graffiti that she (and her co-workers) viewed reasonably could be construed as intimidating, promoting sexual assault, or finding such an assault to be humorous.

Plaintiff also has presented evidence that Lucic promoted the graffiti by showing it to other female employees and joking about it during a meeting. There also is evidence that other employees discussed the graffiti at work, as Campos was surprised to learn that Plaintiff had not heard about the drawings before September 23. Finally, there is evidence that employees uploaded photos of the graffiti to Facebook and potentially viewed the Facebook page during work. A jury reasonably could find that the graffiti, coupled with these related incidents, was sufficiently severe to create an abusive work environment for Plaintiff.

Defendant relies on *Mercer v. Cook County, Illinois*, 527 F. App'x 515 (7th Cir. 2013), in support of its contention that the graffiti at issue is not actionable under Title VII. There, the Seventh Circuit affirmed a district court's grant of summary judgment to an employer where a female plaintiff complained of graphic graffiti in the workplace. The Seventh Circuit's decision in *Mercer*, however, was based on undisputed facts demonstrating that "the defendants promptly and adequately responded to the sexually explicit graffiti." 527 F. App'x at 521. Here, in contrast, there is a dispute of fact over the adequacy of Defendant's response (as addressed in detail below), as well as evidence of additional harassment—including, among other things, that the graffiti was shared among Defendant's employees on the Internet.

### 2.      Conduct based on Plaintiff's gender

To be actionable under Title VII, the conduct at issue must have been based on sex (or based on one of the other characteristics protected by Title VII).  See *Smith*, 189 F.3d at 533 (citing 42 U.S.C. § 2000e-2(a)).   Harassment qualifies as "based on sex" or "because of sex" if it is either sexist or sexual in nature.  See *Berry v. Chicago Transit Authority*, 618 F.3d 688, 691 (7th Cir. 2010) ("The unwelcome conduct [that creates a hostile working environment] can be sexist—demonstrating animus toward women—or sexual.").  Defendant cannot seriously dispute that a reasonable jury could find that portraying Plaintiff performing sexual acts qualifies as conduct that is "sexual" in nature.  A reasonable jury also could find that the conduct was sexist or demonstrated anti-female animus, particularly given that the graffiti included the epithet "bitch," as in the phrase, "Take it Bitch Sherry."  Although "use of the word 'bitch' is [not] harassment 'because of sex' always and in every context," *Passananti v. Cook Cnty.*, 689 F.3d 655, 666 (7th Cir. 2012), when used in a caption for a drawing portraying a woman as an object of sexual exploitation, a reasonable jury certainly could construe the word as being sexist or sexual.

Despite the foregoing evidence of sexist and sexual conduct, Defendant maintains that the drawings were not based on Plaintiff's sex, because men employed by Aramark also were portrayed in the graffiti.  Thus, Defendant argues, the drawings were not intended to harass Plaintiff on the basis of sex, but likely because she was a supervisor.  See [37], Def.'s Mem. at 8. "Title VII does not cover the 'equal opportunity' or 'bisexual' harasser * * * because such a person is not *discriminating* on the basis of sex.  He is not treating one sex better (or worse) than the other; he is treating both sexes the same (albeit badly)."  *Holman v. Indiana*, 211 F.3d 399, 403 (7th Cir. 2000) (emphasis in original).

Although Defendant is correct that the graffiti also portrayed men in a lewd and insulting manner, the Seventh Circuit in *Kampmier v. Emeritus Corporation* found that a female employee at least raised a genuine issue of material fact as to whether harassment was because of her sex where harassment aimed at her was "far more severe and prevalent" than that faced by her male co-workers. See 472 F.3d 930, 940–41 (7th Cir. 2009). The same is true here. Looking at all of the photographs of the drawings, those depicting Plaintiff fairly can be characterized as more offensive, sexual, and sexist than those depicting her male colleagues. See [45], Ex. 9 to Meng Tr. For example, there are no drawings of male colleagues naked, engaging in sex acts, or being sexually exploited or assaulted. The Court therefore concludes that Plaintiff has at least raised a genuine issue of material fact as to whether the harassment that she experienced was because of her sex.

### 3.      A basis for employer liability

"Title VII obligates an employer to take appropriate corrective measures when it knows or has reason to know that one of its employees is sexually harassing another." *Hostetler*, 218 F.3d at 812. In cases of co-worker harassment, an employer is not liable "absent proof that it failed to take appropriate remedial measures once apprised of the harassment." *Id.* at 809. See also *Smith*, 189 F.3d at 533 (noting that an employer will be "vicariously liable" for harassment by a co-worker only if it "negligently failed to take reasonable steps to discover or remedy the harassment."). The employer must "promptly and adequately respond[]" to the harassment to avoid liability. See *Mercer*, 527 F. App'x at 520. The Court weighs the adequacy of the response against the gravity of the harassment to determine whether there is a basis for employer liability. See *Baskerville*, 50 F.3d at 432. An employer typically incurs liability for harassment that it should have prevented, once it is on notice (or should be on notice) of the harassment. See

*Hostetler*, 218 F.3d at 811. An employer also may be held liable if its remedial measure, although stopping the harassment, "inappropriately forces the plaintiff to bear the costs." *Id.*

Given all of the circumstances, the Court concludes that a reasonable jury could find that Defendant's response to the graffiti and related incidents fell short of a prompt and adequate response. At least one other member of the management team, Kuusisto, knew of the drawings by September 21, but failed to report them as required. There also is evidence that the drawings were on display for at least a month. Although there is no affirmative evidence establishing that members of Aramark's management actually knew of the drawings for this entire time, it would not be unreasonable to infer that Defendant should have known, given that the graffiti was displayed in a restroom and several other employees discussed the graffiti at work. For example, Lucic joked about the graffiti during a meeting and others had known about the graffiti for some time.

Further, although the drawings were removed by September 26, there is evidence that the actions of Bruce and Elliott (who were in charge of investigating the incident) fell short of what one might reasonably expect of his or her employer. For example, there is evidence that Bruce took no notes during his "investigation," and that when Plaintiff complained that co-workers were posting photos of the graffiti on Facebook and commenting on them, Bruce shrugged off her concerns. See [45], Ex. A, Meng. Tr. 128:9–24. Elliott declined to view photos of the graffiti, and, according to Plaintiff, took no notes during their meeting and said that she was not going to find the person responsible for the drawings.[4]

---

[4] Plaintiff also argues that Defendant may be held strictly liable for the harassment, regardless of whether its response was adequate, because "supervisory harassment was at issue." [42], Pl.'s Mem. at 15. Plaintiff points to the actions of Lucic, who according to Plaintiff, took two other employees down to the locker room to view the drawings. Defendant does not respond to this argument, but it does not appear likely that Plaintiff may proceed on a strict liability theory. Strict liability only is available where a supervisor is the harasser. See *Erickson v. Wis. Dep't of Corrections*, 469 F.3d 600, 604 (7th Cir. 2006)

Defendant again relies on *Mercer* in an attempt to demonstrate that Defendant's response was sufficient. There, the Seventh Circuit found that an employer promptly and adequately responded to graphic graffiti because "[the plaintiff's two supervisors] promptly removed the graffiti, conducted an investigation that failed to locate witnesses or discover the perpetrator, and announced at several roll calls that such behavior would not be tolerated and would result in discipline. No additional sexually graphic incidents were reported after [the supervisors] issued these warnings." *Mercer*, 527 F. App'x at 521. Here, in contrast, it was Plaintiff—the victim of the harassment—who warned staff about discipline, *not* Bruce (the district manager) or Elliott (of Human Resources). There also is evidence suggesting that Bruce and Elliott did not take the investigation seriously, such as their failure to take any notes, Bruce shrugging off Plaintiff's complaints about the Facebook postings, and Elliott's refusal even to look at the photos of the graffiti that Plaintiff offered to show her during their meeting. Defendant may contest this testimony and the inferences drawn from it, but a triable fact remains.

For all of these reasons, the Court concludes that a reasonable jury could find in favor of Plaintiff on her hostile work environment claim. The Court therefore denies Defendant's motion for summary judgment on this claim.

### B.    Retaliation

Plaintiff contends that three actions taken by Defendant were retaliatory: (1) the transfer to the Elgin location, (2) Bruce telling Plaintiff not to take the position that she was offered in Lake Forest, and (3) her termination when the temporary position in Elgin ended as a result of Chase transitioning to a new vendor. "Title VII prohibits employers from punishing employees

---

(Title VII); *Sangamon Cnty. Sheriff's Dep't v. Illinois Human Rights Comm'n*, 233 Ill. 2d 125, 136–37 (Ill. 2009) (IHRA). Here, there is no evidence that Lucic was Plaintiff's supervisor (to the contrary, Plaintiff admitted that Bruce was her supervisor). Nor is it clear that Lucic's actions with respect to other employees would constitute harassment of Plaintiff.

for complaining about discrimination or other practices that violate Title VII." *Moser v. Indiana Dep't of Corrs.*, 406 F.3d 895, 903 (7th Cir. 2005) (citing 42 U.S.C. § 2000e-3(a)). A plaintiff may prove retaliation using either the director method or the indirect, burden-shifting method. *Id.*

The direct method requires Plaintiff to show that: "(1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action taken by [Defendant]; and (3) a causal connection between the two." *Moser*, 406 F.3d at 903.[5] Alternatively, a plaintiff may establish a *prima facie* case of retaliation by showing that "(1) she engaged in a statutorily protected activity; (2) she met [the defendant's] legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Id.* The burden then shifts to the defendant to present evidence of a non-discriminatory reason for its employment action, at which point the burden shifts back to the plaintiff to demonstrate that the defendant's reason is pretextual. See *id.* at 904. Here, Plaintiff has not offered any evidence that Defendant treated a similarly situated employee who did not complain of harassment more favorably, and therefore she must proceed under the direct method.

Defendant does not dispute (for purposes of summary judgment) that Plaintiff has established that she engaged in statutorily protected activity.[6] Indeed, there is undisputed evidence that Plaintiff complained to Bruce and Elliott about the drawings and related conduct. A reasonable jury could find that voicing her concerns to Bruce and Elliott is sufficient, as

---

[5] To establish retaliation under the IHRA, Plaintiff likewise must show that: "(1) she was engaged in a protected activity; (2) her employer committed a material adverse act against her; and (3) a causal nexus existed between the protected activity and the adverse act." *Hoffelt*, 367 Ill. App. 3d at 634.

[6] Defendant contends that Plaintiff only discussed the harassment with Aramark management after Bruce approached Plaintiff about the graffiti. See [37], Def.'s Mem. at 11 n.4. For purposes of its motion, however, Defendant assumes that this element is satisfied. *Id.*

"[s]tatutorily protected activity 'can range from filing formal charges to *voicing informal complaints to superiors*.'" *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (emphasis in original) (quoting *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004)).

### 1.    Adverse employment action

The anti-retaliation provisions in Title VII only protect against "retaliation that produces an injury or harm," as opposed to "petty slights, minor annoyances, and simple lack of good manners." *Burlington Northern & Santa Fe Ry Co. v. White*, 548 U.S. 53, 67–68 (2006). Accordingly, the challenged employment action must be materially adverse to the employee, meaning that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotation marks omitted). *White* also emphasizes that "[c]ontext matters" when determining whether an employment action qualifies as materially adverse. *Id.* at 69. That is, "an 'act that would be immaterial in some situations is material in others.'" *Id.* (quoting *Washington v. Illinois Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005)).

Plaintiff alleges that being transferred to the Elgin location and Bruce's instruction that she not call back the Lake Forest manager about the position that she was offered qualify as adverse employment actions. A "reassignment of job duties is not automatically actionable," *White*, 548 U.S. at 71; rather, the particular circumstances of the reassignment or transfer must be taken into account. A mere "subjective preference for the former position, without more" does not qualify. *Moser*, 406 F.3d at 904.

Defendant contends that the transfer was not materially adverse because Plaintiff retained the same title, pay, and benefits; the transfer did not impact Plaintiff's career prospects,

Defendant argues, because whether Plaintiff remained at the Chase Tower or moved to Elgin, she was in a temporary position given that Defendant would no longer be working for Chase as of November or December of 2011. Although the transfer, viewed in isolation, does not appear to be materially adverse, the Court must consider the transfer in its appropriate context. Specifically, Plaintiff was transferred to another temporary position as opposed to having the opportunity to accept a permanent position in Lake Forest and remain with Aramark. A reasonable jury could find that Defendant's decision was materially adverse to Plaintiff, because it meant that Plaintiff would be out of a job in a few weeks, as opposed to having the opportunity to accept a permanent position. Defendant disputes whether Plaintiff would have in fact taken the position in Lake Forest, but Plaintiff has testified that she told Bruce that she needed to call the Lake Forest manager back on October 7, but that he responded in an aggressive and harsh tone, telling her "not to call [the manager]," that he would "deal with [the Lake Forest manager], that there was a "change of plans," and that "effective immediately, [she was] going to Elgin." [53], Def.'s Resp. to Add'l Facts ¶ 49.

A reasonable jury also could find that Plaintiff's termination qualifies as an adverse employment action. Plaintiff was discharged in November 2011 after the Chase account closed, as opposed to being "benched" or "floated as promised by Elliott or transferred to an open position, such as the Assistant Food Services Director position for which Plaintiff applied.[7]

### 2. Causal connection

"Title VII retaliation claims must be proved according to traditional principles of but-for causation," and "require[] proof that the unlawful retaliation would not have occurred in the

---

[7] Plaintiff applied for three additional positions with Aramark—regional marketing director, regional brand manager, and talent acquisition manager. Defendant argues that its refusal to hire Plaintiff for these positions was not retaliatory, as Plaintiff was not qualified for any of these jobs. Plaintiff does not dispute or address this argument in her response.

absence of the alleged wrongful action or actions of the employer." *University of Texas Sw. Med. Ctr. v. Nassar*, 133 S Ct. 2517, 2533 (2013). In other words, to prove the requisite causal connection between Plaintiff's complaint of harassment and her subsequent transfer to Elgin and eventual discharge, Plaintiff must show that her complaint was "a but-for cause of the alleged adverse action by [Defendant]." *Id.* at 2534. Causation may be established with either direct or circumstantial evidence. See *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 905 (7th Cir. 2006). Direct evidence "is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Alternatively, a plaintiff may "construct[ ] a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker.'" *Id.* (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)) (discussing circumstantial evidence in the context of a sex discrimination claim under Title VII). Plaintiff does not present any direct evidence—such as an admission of retaliatory intent by Defendant or its agents—and therefore must rely upon circumstantial evidence to demonstrate a material issue of fact with regard to causation. Circumstantial evidence includes, among other things, suspicious statements, timing, or behavior, see *Troupe*, 20 F.3d at 736, but "[s]uspicious timing alone rarely is sufficient," *Moser*, 406 F.3d at 905. Although this case presents a close call, the Court concludes that Plaintiff has established a plausible theory of causation through various pieces of circumstantial evidence that, taken together, would allow a reasonably jury to infer retaliatory intent.

First, Bruce's "change of plans" with respect to the Lake Forest position just a few days after Plaintiff met with Elliott to discuss the harassment is open to differing interpretations. During this time period, Bruce was trying to find new positions for the managers that he

supervised because the Chase account was closing. Bruce informed Plaintiff of a permanent managerial opening in Lake Forest, and Plaintiff was offered the position after a job interview on October 3, 2011. Plaintiff complained to Elliott the next day about the graffiti, and Elliott did not take notes or ask to see the photographs that Plaintiff had taken of the graffiti. Three days later, when Plaintiff needed to call the Lake Forest manager back about the position, Bruce angrily instructed Plaintiff not to accept the job, as there had been a change of plans and she was being transferred to Elgin. Although there was, in fact, an unexpected vacancy in Elgin that needed to be filled, the vacancy had existed since late September, before Plaintiff met with Elliott about the graffiti. See [38], Def.'s Fact Stmt. ¶ 55. In other words, the position presumably needed to be filled before Bruce told Plaintiff about the position in Lake Forest; Bruce offered no explanation for the "change of plans" that apparently arose during the week of October 3 when Plaintiff met with Elliott.

Second, Elliott and Bruce stated that (at least one reason) for Plaintiff's transfer to Elgin was alleviating Plaintiff's discomfort with continuing to work at the Chase Tower. Bruce stated in an October 10, 2011 email to his supervisor and others that Plaintiff was moved to Elgin because Plaintiff "expressed to [Elliott] that she was uncomfortable" at the Chase Tower. [53], Def.'s Resp. to Add'l Facts ¶ 42. Likewise, in Defendant's December 2011 submission to the EEOC, it explained that its primary reason for the Elgin transfer was ensuring that Plaintiff was comfortable at work. See [45], Ex. 4 to Bruce Tr. Given that Plaintiff disputes telling Elliott that she wished to leave the Chase Tower because she was uncomfortable, a reasonable jury could infer that Plaintiff's "discomfort" was pretext for a retaliatory transfer that left Plaintiff out of a job a few weeks later.

Third, the Court agrees with Plaintiff's contention that Defendant has been somewhat inconsistent with respect to its reasons for the transfer and the circumstances surrounding the graffiti. Defendant contends here that the transfer was based on "legitimate business reasons"— namely, the resignation of the food director at the Elgin location and Plaintiff's performance issues. See [37], Def.'s Mem. at 13; [52], Def.'s Reply at 10. In 2011, however, Bruce told his superiors that the decision was based on Plaintiff's discomfort with continuing to work at the Chase Tower. See [53], Def.'s Resp. to Add'l Facts ¶ 42. Additionally, in Defendant's 2011 EEOC statement, Elliott wrote that Plaintiff "failed to notify her own HR Team, her District Manager, Mr. Bruce, or even the Employee Hotline of [the graffiti]," [45], Ex. 4 to Bruce Tr., even though Bruce previously corrected Elliott on this point. See [45], Ex. 5 to Bruce Tr. (writing in a September email to Elliott that Plaintiff "had no issue brining [the graffiti] to [his] attention" and that he did not understand where Elliott's "allegation [that Plaintiff failed to promptly inform them of the graffiti] was coming from."). In light of these inconsistencies, it would not be unreasonable for a jury to infer that Defendant has not been forthright about the reasons for the transfer to Elgin and the subsequent termination. Cf. *Pryor v. Seyfarth Shaw*, 212 F.3d 976, 979 (7th Cir. 2000) ("Disbelieving a witness's testimony about one of the material facts in a case can justify the trier of fact in disbelieving the witness's contested testimony on other material facts.").

Finally, a jury reasonably could find that Plaintiff's termination and Defendant's refusal to offer her the vacant position at Loyola for which she applied were linked to the harassment complaints, given the circumstantial evidence described above. In addition, there is evidence that, prior to her meeting with Elliott, Elliott promised that managers like Plaintiff would be "benched" or "floated" for six months following the closure of the Chase account. Defendant's

contention that Plaintiff was not offered the vacant position at Loyola because she was overqualified or wanted a higher salary also could reasonably be disbelieved because the Lake Forest position that Plaintiff interviewed for and was offered also was an "assistant" food services director position. [53], Def.'s Resp. to Add'l Facts ¶ 34.

For all of these reasons, the Court denies Defendant's motion for summary judgment on Plaintiff's retaliation claim, to the extent that Plaintiff claims retaliation with respect to Defendant's decisions to (1) transfer her to Elgin (instead of allowing her the opportunity to accept the permanent position in Lake Forest), and (2) terminate her in November 2011, without the option of "benching" or "floating" her for six months or offering her the vacant position at Loyola.[8]   Although Defendant has offered reasons for its employment decisions—including legitimate business needs, Plaintiff's performance, Plaintiff's uncertainty about whether she wanted to work in Lake Forest, and the loss of the Chase account—Plaintiff has presented sufficient circumstantial evidence of retaliatory motive.  The Court therefore concludes that a reasonable jury could find that—in the absence of her complaints—Plaintiff would not have suffered the adverse employment decisions described above.   Plaintiff thus may proceed on her retaliation claim.

## IV.   Conclusion

For all of the foregoing reasons, Defendant's motion for summary judgment [36] is denied.  This case is set for status on 4/21/2015 at 9:00 a.m.

---

[8] As discussed, Plaintiff may not proceed on the theory that Defendant's failure to offer her the other three positions to which she applied was retaliatory.

Dated:  March 23, 2015

Robert M. Dow, Jr.
United States District Judge